UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GOOGLE LLC,

                                    Plaintiff,                    Civil Action No.: 1:21-cv-10260-DLC

- against -

DMITRY STAROVIKOV;
ALEXANDER FILIPPOV;
and Does 1-15,

                                    Defendants.
------------------------------------------------------------------X

**DECLARATION OF ATTORNEY IGOR LITVAK IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS AGAINST DEFENDANTS AND THEIR COUNSEL AND IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AGAINST THE PLAINTIFF AND ITS COUNSEL**

I, IGOR LITVAK, declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S. Code § 1746 that the following is true and correct:

1.      I represent Defendants DMITRY STAROVIKOV and ALEXANDER FILIPPOV in this matter. I submit this Declaration in opposition to Plaintiff's Motion for Sanctions and in support of Defendants and their counsel's Motion for Sanctions against Plaintiff.

2.      I believe that Plaintiff's counsel has engaged in a pattern of a harassing and smear campaign against Defendants and their counsel. As a starting point, Plaintiff's lead counsel Laura Harris misled the Court when she claimed in her motion papers that the Defendants somehow waived jurisdiction when it was clear from the multiple conversations and emails that no such thing ever happened. Ex. 1, p. 17-19.

3.      Then after the June 1st, 2022 conference, Ms. Harris again lied to the Court when she stated that "Mr. Litvak stated that his clients would not agree to travel to any country

from which the United States may be able to extradite them." Ex. 2, p. 1-2. I never said such a thing, I was responding to Ms. Harris' questions when I believe I said something to the effect of "of course no one wants to be extradited to the U.S., and my clients are no different," later adding "but it doesn't mean they won't attend depositions or comply with their discovery obligations." I definitely never stated that the "Defendants won't travel to a country with an extradition treaty with the U.S." This is something that was added by Ms. Harris to serve her and her client's needs. That off-cuff remark was twisted by Ms. Harris into something completely different and with apparent success as it misled the Court into suspending the agreed-upon discovery schedule while stating that Defendant's counsel "has not been candid with the court." Ex. 3.

4.       Ms. Harris' misrepresentations continued when she claimed in her July 19, 2022 letter that "Defendants' counsel acknowledged that Defendants work closely with the individuals they identified," Ex. 4. This is just not true, as I only stated that the Defendants worked with the individuals in question in the same location at some point in the past. Ex. 5.

5.       Then Ms. Harris used an old recording that was posted on YouTube to claim that I was advising clients to hide their laptops. Ex. 3. However, even after being advised of the recording's circumstances and that it predated this case by many months, Ex. 6, the Plaintiff's counsel still egregiously continues to proffer that transcript as somehow relevant to this case, even using it in its motion for sanctions. See Dkt. 103-8, see also Dkt. 112-19.

6.       Ms. Laura Harris even goes so far as to lie in her motion for sanctions against the Defendants and Counsel when claiming that she only learned on July 19, 2022, that the Defendants left Valtron and returned their laptops after leaving. In fact, and as corroborated by emails, Court filings, and the discussions held during the July 29th court telephone conference,

I informed Ms. Harris about this on June 27th, 2022, during our meet-and-confer to discuss the Defendant's initial disclosures. But it took almost a month after that conversation for Ms. Harris to start manufacturing some wild accusations about devices being hidden from Plaintiff and claiming that Defendants got involved in spoliation, which is completely baseless.

7.     The only thing the undersigned counsel is guilty of is having a misunderstanding with the Defendants as to their employment status at Valtron. From the day I was retained in mid-February until May 20th, 2022, I was under the impression that the Defendants still worked at Valtron. As a consequence of that misunderstanding, some erroneous information percolated into some of the pleadings, but it was not intentional. Most importantly, once I learned from the Defendants about the correct status as to their Valtron employment, and then later on June 16th, 2022, that they had no devices or ESI to turn over to Plaintiff as part of discovery, I disclosed it to Ms. Harris soon after, on June 27th, 2022. Now, as with many things before, Plaintiff and its Counsel are using a misunderstanding between Defendants and their Counsel, which did not prejudice Plaintiff in any way, to seek another default while asking to be paid for their frivolous sanctions motion.

**Defendants Move to Vacate Entry of Default**

8.     On February 15th, 2022, I emailed Laura Harris writing the following

> Hello Counsel, I am in the process of being retained by Dmitry Starovikov and Alexander Filippov in the above-mentioned case and expect to file a NOA in a few days. I am emailing to ask that once I file my NOA that you withdraw your motion for default judgment and consent to defendants filing a late answer, which I expect to file a few weeks after filing my NOA. The defendant will consent to personal jurisdiction in this matter. If you need to reach me please call my cell at 646-796-4905, thank you. Sincerely.

Ex. 7. The email clearly asked Ms. Harris to withdraw "your motion for default and consent to **defendants to filing a late answer**," later adding that "the defendants will consent to personal jurisdiction in this matter." An hour and a half later, I sent another follow-up email stating:

> Counsel, I had a chance to review the docket closer and see that the Notice of Default was already filed, and therefore, as a follow-up to my email, I would ask that you move to set aside this notice or we gonna file a motion to set it aside, thank you. Please call me to discuss this further, 646-796-4905, thank you. Sincerely.

Ex. 8. The following day Ms. Harris responded by email, writing "Mr. Litvak, Thank you for your email.  We are conferring with our client regarding your request, but please let me know if there are any windows when you are available to speak this afternoon or tomorrow. Thank you, Laura" Ex. 9.

9.       Parties then again corresponded by email and held a telephone conference on February 17th, 2022, during which I made it very clear to Ms. Harris that the Defendants would **only consent jurisdiction on the condition** that the Plaintiff vacates Notice of Default and allows Defendants to file an answer in the case. We also discussed settlement options as I informed Ms. Harris that the Defendants wanted to settle the case, Ms. Harris responded that Google was interested in the same.

10.       After the above-mentioned correspondences and a telephone conference, there should have been no question that the Defendants were only consenting jurisdiction **on the condition** the notice of default is waived, and they can file an answer. Nevertheless, even though **that condition was never met**, Ms. Harris still argued in her memo of law opposing Defendant's motion to set aside the notice of default that "Defendants waived any personal jurisdiction through their counsel" and therefore the Defendants did not present a complete and meritorious defense based on lack of personal jurisdiction." Ex. 1. p. 9.

11.     The undersigned counsel's initial retainer was limited to either settling the case or filing a motion to vacate the notice of default. On February 17th, 2022, I held a conference with Mr. Starovikov and Mr. Filippov, during which we discussed what their discovery obligations were, including concerning devices and ESI, and I specifically directed Defendants to preserve all discoverable documents, devices, and ESI. The next time I discussed anything specific with Mr. Starovikov and Mr. Filippov regarding devices or ESI was on May 20th, 2022.

12.     When working on the motion to vacate the notice of default, I never discussed with Defendants whether they were still employed at Valtron, but since I was not told otherwise, I assumed that they still were. When preparing their initial declarations, I used the word "work" when describing their employment status, writing "I work for Valtron LLC as a software engineer." Dkt. 47-2, Dkt. 47-3. However, when drafting the memo of law, I used the word "worked" when describing the same "defendants worked for Valtrorn LLC as software engineers and the company's products branded Voltonwork and Undefined.team." Dkt. 47-1, p. 10.

13.     Defendants spend most of the time reviewing the memo of law, which used the word "worked" and therefore they did not see any issues with its content. The declarations they signed the day the motion was due, March 14th, 2022, and barely had a chance to review them carefully, or translate them properly. Ex. 10. They, therefore, did not notice the distinction between the two words "worked" and "work" in the declarations before signing them. There is nothing else in those declarations or pleadings related to the motion to vacate the notice of default that states that the Defendants still work at Valtron. For example, Defendant's Reply memorandum of law also stated that the "Defendants "**worked**" as "software engineers" for

Voltron LLC," which also did not raise red flags for the Defendants when they reviewed it. Ex. 11. When discussing with them after May 20th, 2022 why they never told me that they left Valtron earlier, Mr. Starovikov and Mr. Filippov told me that they were under the impression that I was aware of that, and the wrongful usage of the word "worked" in the pleadings significantly contributed to that belief.

14.     On April 27th, 2022, the Court granted Defendant's motion to set a side notice of default. ECF 62. However, it appears that Defendant's present employment status at Valtron played no role in the Court's decision. Id. As such, Plaintiff was not prejudiced by this inadvertent inaccuracy.

**Defendants Counterclaims Alleging Tortious Interference**

15.     After the decision on Defendant's motion to set a side notice of default came out on April 27th, 2022, and I was gearing up to draft an answer, Defendant's informed me that they were suffering negative consequences of Google's lawsuit. It took them years to build a reputation and make a name for themselves in the Russian IT scene. Besides working for Valtron they had many other projects planned with Valtron CEO, some of Valtron clients, and other members of the Russian IT industry. But now, as a result of Plaintiff's lawsuit, all the opportunities were drying up as they became a pariah in the Russian IT industry and were being shunned by everyone. One of the Defendants could not even rent an apartment as every time someone searched their name on the Internet this case would come up. They believed and still believe they were ruined professionally and financially by Google's lawsuit and the accompanying publicity. This is why during the June 1st Court conference, I told the Court:

> It's preventing my clients from engaging in **normal business activity**. They tried -- they closed the e-mails. They are closing everything. And they are using this as a weapon to basically go after my clients. **So even if they**

**agreed to permanent injunction, the Google will still continue to go after them**.

Ex. 11, p. 12. Considering those allegations, I proposed a language for the counterclaims that I believed described their situation, describing present and prospective **business relationships**, which were ruined as a result of Google's lawsuit. Ex. 13. Nowhere does it say in the counterclaims that the Defendants were "presently employed" as was claimed in Ms. Harris' letter of August 11th, 2022. Ex. 14.

16.    The counterclaims were filed on May 11, 2022, and on May 20 Defendants informed me for the first time that they left Valtron at the end of 2021. After I heard that I advised the Defendants that we would most likely need to amend the counterclaims or withdraw them. We decided to consider our options over the weekend and discuss the same the following week. Then on Monday, May 23, 2022, I received an email from Ms. Harris stating that the "counterclaims are plainly deficient and fail to state a claim." Ex. 15. In the email, Ms. Harris asked me to withdraw the counterclaims or be faced with a motion to dismiss. Id. I discussed the same with the Defendants the following day, and since the Defendants did not have the financial recourses to engage in additional litigation regarding the counterclaims, regardless of how we amended them, they decided to voluntarily dismiss the counterclaims. I emailed Ms. Harris that same day stating "Laura, I discussed the counterclaims with my clients, they agreed to withdraw them." Id. Subsequently, I filed a notice of voluntary withdrawal that same day, meaning the counterclaims only existed for 13 days and did not cause any prejudice or harm to Plaintiff. Ex. 16.

**Negotiations Over the Location of the Defendants' Deposition**

17.    Defendants are willing to participate in the discovery and provide documents, and they have done nothing to suggest otherwise. Defendants are willing to be

deposed in Kazakhstan inside a U.S. embassy any day since now this is the only place where they can legally travel as it doesn't require a Russian international passport. In fact, the Defendants applied for such passports and are awaiting their approval. See Ex. 17. Plaintiff's Counsel never explained the difference between the deposition taking place in the U.K., Irland or Spain, or Kazakhstan. Instead, Plaintiff proposed countries it knew Defendants could not travel to and then blames the Defendants for having no intention of participating in discovery or being deposed.

18.     The war in Ukraine had a very negative effect on the ability of Russian citizens to travel internationally. Even assuming that the Defendants can obtain Russian international passports, the U.S. Embassy in Russia is closed and has stopped issuing US visas since April of 2021. See https://www.ustraveldocs.com/ru/ru-gen-faq.asp, see also https://ru.usembassy.gov/visas/. To get to any country for deposition suggested by the Plaintiff will require a Schengen or a U.K. visa issued to the Defendants. As a result of the war in Ukraine, many European countries stopped issuing visas to Russian nationals and there are serious discussions within the E.U. to either significantly limit such visas or completely ban all E.U. visas for Russian nationals. See https://www.bloomberg.com/news/articles/2022-08-25/russians-face-european-travel-hurdles-as-eu-mulls-restrictions.

19.     In fact, it is already almost impossible to get a Schengen or a U.K. visa for a Russian citizen, regardless of the circumstances. See https://www.fragomen.com/insights/united-kingdom-surcharge-and-visa-refusals-for-russians-possible-per-new-law.html, see also https://www.wsj.com/articles/eu-to-suspend-visa-agreement-with-russia-11661953747. Plaintiff and its Counsel, both of whom used to have a major presence in Russia, know all of this but still insist that the Defendants are deposed in

countries to which they cannot travel to. Google recently had to move hundreds of its employees

out of Russia to Dubai, which does not require Visas for Russian citizens. See

https://www.wsj.com/articles/google-subsidiary-in-russia-to-file-for-bankruptcy-11652876597.

Why didn't Plaintiff's Counsel suggest Dubai as an option is not explained, but it appears that

Dubai is a good enough place for Google's Russian employees but not a good enough place to

conduct a deposition.

20.     There is no doubt that Plaintiff insists on the depositions taking place in

the U.K., Irland or Spain, or the U.S. for the sole purpose of triggering a default since it knows

that it would be almost impossible for Mr. Starovikov and Mr. Filippov to travel to those

countries any time soon. For the Plaintiff and its Counsel, there is no difference where the

deposition takes place, but they keep insisting on Western Europe as the only option to gain

litigation advantage, trigger a default and finally win this case at any cost.

21.     The undersigned counsel never guaranteed or promised that the

Defendants would appear for depositions in any particular country or that they would even be

able to leave Russia. In fact, during the June 1st Court conference, I specifically requested that

the depositions take place virtually because there was no way for the Defendants to leave Russia

or travel to any country. See Ex. 12, p. 11. I also informed the Court that it would be also very

difficult for the Defendants to come to the U.S. for trial. Id. Then in my June 14th letter, I wrote

that "in the worst-case scenario, if their U.S. visa applications are denied, or if they are not able

to leave Russia for other reasons beyond their control, they are willing to appear at trial

virtually." Ex. 18, p. 2.

22.     Considering the war in Ukraine, the biggest European land war since

World War Two, and the accompanying restrictions on Russian citizen's ability to travel

internationally, especially to Europe, something Plaintiff is fully aware of, Mr. Starovikov and

Mr. Filippov are doing all they can to obtain their international passport so they can appear in

some neutral country for depositions. But even if they can obtain those passports, considering the

visa and flight restrictions between Russia, Europe, and the U.S., Mr. Starovikov and Mr.

Filippov cannot guarantee that they would be able to appear in the countries proposed by

Plaintiff for their depositions. Therefore, Kazakhstan remains the most realistic option and the

Defendants are willing to appear there for depositions on short notice. Please note that on

September 16, 2022, the undersigned counsel will update the Court on the status of Defendant's

efforts to obtain international Russian passports.

23.     Plaintiff's suggestions that Defendants are not making genuine efforts to

obtain international passports, or of having no real intention to participate in depositions or

discovery is remarkable considering that it was Ms. Harris who, after the June 1st, 2022 Court

conference, during the parties meet and confer, told me that Google did not want to provide any

discovery to the Defendants, believing they will use it for some illicit purpose. This means that

Google and its counsel filed this lawsuit and never had any intention to comply with its

discovery obligations.

**Negotiations Over the Language of the Joint Status Report**

24.     The first version of the proposed joint status report was emailed by King

and Spalding to me on May 17th, 2022, at 1:58 pm. Parties also scheduled a conference to discuss

the same the following day. Before that, we never discussed anything related to ESI or devices.

When I received the proposed joint report on May 17th, 2022, I was under the impression that the

Defendants still worked for Valtron and had access to the ESI and Devices. King and Spalding's

May 17th, 2022 contained paragraph C, which concerned the ESI and stated the following:

> The parties anticipate that the scope of discovery will encompass Electronically Stored Information ("ESI"). The parties will request ESI in the form or forms that facilitate efficient review of ESI. Google also anticipates that it will request to inspect Defendants' computers and other devices used in their business practices described in the Complaint and Defendants' declarations, and requests that the Court order Defendants to preserve such computers and/or devices for production in this litigation.

Ex. 19. Later that day, at 10:21 pm, but before having a chance to review the proposed joint status report with the Defendants, I emailed back revised paragraph C

> The parties anticipate that the scope of discovery will encompass Electronically Stored Information ("ESI"). The parties will request ESI in the form or forms that facilitate efficient review of ESI. Google also anticipates that it will request to inspect Defendants' computers and other devices used in their business practices described in the Complaint and Defendants' declarations, and. Similarly, Defendants reserve their rights to inspect Plaintiff's computers and other devices used in its business practices relating to the allegations described in the Complaint and Plaintiff's declarations. Reciprocally, Defendants request that the Court order Plaintiff to preserve such computers and/or devices for production in this litigation.

Ex. 20. At this point, all I wanted to do was to make paragraph C reciprocal, as I did not anticipate that my clients would not be able to turn over any ESI or devices.

25.     On the following day, May 18th, 2022, the parties held a conference during which I asked whether the language in paragraph C was necessary. At this point, I have not yet discussed anything with the Defendants about specific devices or ESI so, therefore, I was envisioning a language we eventually ended up with, a more watered-down version without mentioning anything about computers. Nevertheless, Laura Harris insisted that the language was necessary, to which I did not object, and we decided to keep it, including the part I added the

prior evening - "[s]imilarly, Defendants reserve their rights to inspect Plaintiff's computers and other devices used in its business practices relating to the allegations described in the Complaint and Plaintiff's declarations. Reciprocally, Defendants request that the Court order Plaintiff preserve such computers and/or devices for production in this litigation." Id. Nothing else was discussed related to specific devices or ESI, or what devices anyone had or planned to produce.

26.    On May 20th, 2022, I was finally able to speak with my clients and review with them the proposed joint status report, including paragraph C. This was when, for the first time, Defendants informed me that the **LAPTOPS** they used while working for Valtron had since been returned to Valtron when they stopped working there at the end of 2021. I asked them do they have, or could they get access to those laptops or any other ESI or devices that may be somehow related to the case. There was a discussion of getting access to some server, asking Valtron CEO for laptops back, and trying to find other devices and ESI. Mr. Starovikov and Mr. Filippov told me they would do their best to obtain what they can so it could be produced as part of discovery.

27.    After speaking with the Defendants on May 20 I still believed that they had, would find, or would gain access to some other devices/ESI related to this case. So, on May 20 I again modified paragraph C and at 6:07 pm emailed it to Ms. Harris, adding the following language to the previous version of Paragraph C proposed by me on May 17th, "**over which the defendants have actual and physical control and possession.**" Ex. 21.

28.    The email itself stated, "Laura. see the revised join report attached, **let me know if you see any issues**, thanks." Id. After emailing this new proposed language no one from King and Spalding emailed or called me to discuss anything about this new addition. Instead, parties held conferences on May 24th and on May 27th of 2022, during which many issues related

to the case were discussed, but not what devices Plaintiff or Defendants had or even whether any

party had any devices at all which they planned to turn over.

        29.      On May 31st, 2022, at 1:42 pm, the day the joint status report was to be

filed in Court, I received from King and Spalding a new counterproposal for paragraph C, which

contained the following language:

> The parties anticipate that the scope of discovery will
> include Electronically Stored Information ("ESI"). The
> parties will request ESI in the form or forms that facilitate
> efficient review of ESI. While the parties reserve all rights
> in this regard, they agree to preserve ESI and any relevant
> computers and/or devices for the duration of this litigation.

Ex. 22. I had concerns about this new proposal since, by this date, I have not yet heard back from

the Defendants as to what ESI or devices they were able to get, and Plaintiff's new language took

out "**over which the defendants have actual and physical control and possession.**"

Responding by email an hour and a half later I wrote

> Laura an Luke, the revised report is fine with few
> exceptions, my clients cannot agree to not oppose any
> potential motion for default judgment against Does, we
> haven't even seen the motion and you already want them to
> waive any right to oppose it, please take it out. Second,
> why we took out the paragraph about exchanging
> computers, I liked the initial version much better, can we
> keep it. Lastly, regarding protective orders, I added a
> language that we will do our best to reach an agreement on
> one, I think its better that way since we never know what
> might happen. See attached.

Ex. 23. Lauras Harris is trying to convince the Court that the question "why we took out the

paragraph about exchanging computers, I liked the initial version much better, can we keep it" is

somehow tantamount to a pressure campaign to induce devices exchange while giving nothing to

the Plaintiff. It is not.

30.     First, I have never discussed anything about specific devices with anyone at Kings & Spalding, and I never told anyone what devices Defendants had or planned to turn over or whether they had any devices at all. Also, I never demanded any specific devices or ESI from Plaintiff. The reason why we did not discuss devices and ESI was completely the fault of Ms. Harris; she intentionally never discussed anything about Google's devices or ESI, as if this information would be somehow detrimental to Google if the Defendants found out about it. Since Mr. Harris did not talk or say anything about Google's devices or ESI, I did the same, and the parties ended up never discussing anything specific about any devices or ESI. Practically everything that was discussed regarding paragraph C is contained in the emails provided to Court as exhibits.

31.     Second, it is not a statement; it is a question that does not demand or request any devices. In other words, it is asking why a certain action was taken relevant to a certain paragraph, "why we took out the <u>paragraph</u>," and requesting to go back to a previous version. I may have as well written why you changed paragraph C or why you took out the statement "**<u>over which the defendants have actual and physical control and possession</u>**."

32.     Third, as shown in the correspondences below, there are no other reasons or any evidence for Plaintiff Counsel's claim that the question was somehow a ploy to get Google's devices. Together with that question, I attached the proposed Joint Status report with Plaintiff's newly proposed paragraph C highlighted. Ex. 24. Not long after Mr. Harris emailed back, stating, "[t]hank you, Igor. Please send across the changes you wish to make. We are having trouble understanding the highlighting in the document attached to your email." Ex. 25. Ten minutes later, I responded back, attaching the proposed Joint Status report with the previous version of paragraph C included and highlighted and in the comments writing – "[t]his is what

we had in the previous version, let's keep it." Ex. 6. Shortly thereafter, Ms. Harris wrote me:

> Thank you, Igor.  We are generally fine with your first and last proposed changes.  We have some questions about your proposed changes to Sections C and E and think at this stage a quick phone call to discuss is the best path forward.  Are you available now (or at some point in the next hour)?  We can send along a calendar. Separately, for planning purposes we'd like to discuss whether your clients intend to come to New York for in-person depositions, and if not, where they propose to make themselves available for in-person depositions.

Ex. 27. Later in the day, the parties held a conference to finalize the Joint Status report. During the conference, Laura Harris made it clear that she did not want to go back to the previous version of paragraph C proposed by me on May 20th, which contained the language "**over which the defendants have actual and physical control and possession**."

33.     Instead, she wanted to stick with her version proposed that morning. I asked for some time to think about it and propose possible revisions. Most importantly, during the May 31st, 2022 conference, the **PARTIES NEVER DISCUSSED** anything about specific devices or whether Plaintiff or Defendants had any devices in their possession that they planned to turn over. Parties did discuss other paragraphs, including paragraph E. Later that day, Ms. Harris emailed writing in part, "[w]e'll keep an eye out for your crack at revisions to Section C (regarding ESI) based on our call." Ex. 28. After the conference, I submitted yet another proposal for paragraph C

> The parties anticipate that the scope of discovery will include Electronically Stored Information ("ESI"). The parties will request ESI in the form or forms that facilitate efficient review of ESI. While the parties reserve all rights in this regard, they agree to preserve ESI and any relevant computers and/or devices for the duration of this litigation. Plaintiff to preserve such computers and/or devices for production in this litigation. Defendants preserve all their

rights to discovery under the federal rules of civil
procedure.

Ex. 29.

34.     The only language I added to Plaintiff's proposal was "Plaintiff to
preserve such computers and/or devices for production in this litigation. Defendants preserve all
their rights to discovery under the federal rules of civil procedure." Id. Ms. Harris responded at
9:09 pm writing:

> Thank you, Igor. I think we are close, but your revisions to
> Section C are not consistent with where we thought we left
> our discussion. We think it is important that both sides have
> the same obligations with respect to production format and
> preservation. In the interests of going to an agreement,
> please let us know if you consent to the language below. If
> so, we will get this on file. Proposed Language for Section
> C: The parties anticipate that the scope of discovery will
> include Electronically Stored Information ("ESI"). The
> parties will request ESI in the form or forms that facilitate
> efficient review of ESI. The parties reserve all rights in this
> regard, but affirm their obligations under the Federal Rules
> of Civil Procedure, including as to the preservation of
> relevant evidence.

Ex. 30.

35.     An hour later, I responded by writing, "[y]our proposed changes are fine.
Thanks." Ex. 31. Later that night, King and Spalding filed on ECF the proposed joint status
report, which contained **PLAINTIFF'S** proposed language for paragraph C

> The parties anticipate that the scope of discovery will
> include Electronically Stored Information ("ESI"). The
> parties will request ESI in the form or forms that facilitate
> efficient review of ESI. The parties reserve all rights in this
> regard, but affirm their obligations under the Federal Rules
> of Civil Procedure, including as to the preservation of
> relevant evidence.

Ex. 32. I agreed to this language because it described what I knew at the time regarding Defendant's devices and ESI as it stated "anticipate," and at the time, I did anticipate that the Defendants would produce some devices and/or ESI.

36.    While negotiating the Joint Status report, never during any emails or conferences did I inform anyone from King and Spalding nor was I asked by anyone from King and Spalding what types of devices Defendants actually had and what devices they planned to turn over. I was trying to negotiate the most favorable joint status report for my clients and come up with the best language to do so. I am not in a position to tell Laura Horris how to do her job but had she asked me during the multiple conversations and emails while negotiating the Joint Status report what devices my clients had, of course, I would have told her what I knew at the time, including that on May 20th, 2022, I found out that Defendants returned their laptops to Valtron but they still would provide whatever they could get. But this issue never came up and was never discussed by the attorneys. I am sure it was assumed that Defendants had some devices/ESI, just as I did at that moment, but by not confirming or discussing anything with me about it, Ms. Harris assumed at her own peril.

**Initial Disclosures and Disclosure Regarding Devices to Plaintiff's Counsel on June 27**

37.    While preparing initial disclosures on June 16, 2022, I again spoke with my clients and asked them what other devices or ESI they got that may be related to Valtron or this case. To my surprise, they informed me that they could not find or get any and therefore did not have any other ESI or devices related to Valtron. Later that day, I finalized the Initial Disclosures and emailed them to King & Spalding. Ex. 33. The emailed initial disclosures **did not list any devices or ESI**. Id. On June 23, 2022, I received an email from King and Spalding arguing that the Initial Disclosures were deficient for various reasons, including

> Fifth, your document disclosures are also facially deficient.
> Rule 26 requires you to furnish a "copy or a description **by
> category and location of all documents, electronically
> stored information, and tangible things** that the
> Defendants have in their possession, custody, or control,
> **that they may use to support their claims or defenses**."
> (emphasis added). It is unacceptable to describe documents
> in a catch-all fashion

Ex. 34.

38.     Responding the next morning, at 1:04 am, I wrote "[h]i, I will discuss with

my clients amending the initial disclosures tomorrow, and hopefully will obtain additional

information to address your concerns. Can we meet and confer Monday morning, Thank you."

Ex. 35.

39.     Later that day, the parties made plans to speak Monday morning about

initial disclosures at 10 am. Id. On Monday morning, June 27, 2022, the parties held a Microsoft

teams conference to discuss the initial disclosures. Ex. 36. This is when during the Microsoft

Teams Conference on June 27 I told Ms. Harris that the Defendants recently informed me that

they left Valtron and returned their devices to Valtron after leaving and had no other ESI or

devices in their possession. Ms. Harris, while sounding skeptical, did not try to claim that I told

her before that my client had any devices to turn over.

40.     Later that day, I amended the Initial Disclosures and emailed them to King

& Spalding, again **I did not list any devices or ESI**. Ex. 37. After emailing the Initial

Disclosures, I did not hear from King and Spalding until July 18th, 2022, when Ms. Harris

emailed regarding them. Ms. Harris started her email by writing "I'm writing to follow up on **our

June 27 call** and your clients' amended initial disclosures." Ex. 38 at p. 2.

41.     She continues by writing in part

> [w]e are troubled by your representations **on our call that (i) your clients do not "have" any relevant devices, and**, in apparent contradiction to that representation, that (ii) any devices they do "have" are owned by Valtron and therefore are not discoverable . . . [r]egardless, the question whether any particular device is owned by Valtron is irrelevant. If your clients have the practical ability to obtain documents or devices that might be relevant to the case, they are obligated to produce those materials.

<u>Id.</u>

   42. Ms. Harris concludes the email by stating, "[p]lease let us know immediately if you intend to continue to object to the production for inspection of any electronic devices, or if your clients contend they no longer possess any devices. <u>Id</u>. at p. 3. After some back and forth that same day I responded the following day, writing on July 19

> Laura, I never said that my clients preserved, had in their possession or intended to produce any devices subject to discovery, I am not sure where you got that from. **The last time we discussed this issue I told you all the devices were returned to Valtron when they finished working for Valtron, and therefore, they do not have any devices in their possession that are discoverable, there is no contradiction.** Perhaps maybe you misunderstood me or I misspoke, I am not sure, but to clarify, right now my clients do not have any devices in their possession that would be subject to discovery and there is no way for them to get those devices back from Valtron. There is nothing else my clients can provide in the initial disclosures. Igor.

<u>Id</u>. at p. 1.

   43. Later that day King & Spalding filed a letter on ECF arguing that Defendant's initial disclosures were deficient, which triggered the July 29th Court telephone conference and the present discovery dispute before the Court. Ex. 39.

   44. During the July 29th, 2022, Court conference, I stated three times that I informed Ms. Harris on **June 27** that the Defendants left Valtron and returned their devices to

Valtron after leaving. Ex. 40 p. 13, 14, 19. Not once did Ms. Harris correct me stating that she thought it was on July 19th as she now claims in her motion for sanctions. Dkt. # 111, p. 5, 8. In fact, in her memo of law for sanctions, on page 8, she writes:

> On July 19, Google identified continuing deficiencies in Defendants' initial disclosures. Mr. Litvak responded that they "have nothing else to add," **and he represented for the first time that Defendants "finished working for Valtron," "all the devices were returned to Valtron,"** and Defendants "do not have any devices in their possession that would be subject to discovery and there is no way for them to get those devices back from Valtron."

Dkt. # 111, p. 8.

45.     So, on July 18 Ms. Harris emails me clearly stating that we spoke on June 27 and during that conversation, I told her about the Defendants leaving Valtron and returning their devices. But in her memo of law in the motion for sanctions, Ms. Harris now claims that I told her about it on July 19.

46.     There is no doubt that Ms. Harris is lying to the Court, as she has done repeatedly throughout this litigation. The only difference in this instance is that this time her lie is confirmed by her own email. She even sent me an email on July 18 stating, "thank you, Igor. Please also confirm whether your clients intend **to continue to object to the production of electronic devices, or if your clients contend they no longer possess any devices.**" Ex. 38, p. 1. How can she email me this on July 18 when she claims I first told her about this on July 19? Ms. Harris is doing this to gain an advantage in litigation, just as she did when she lied to Court by stating that "Defendants waived jurisdiction" or lying when by accusing me of saying, "Defendants won't travel to a country with an extradition treaty with the U.S." during the June 1st meet and confer. Clearly, such conduct is intentional and sanctionable.

**Defendant's Counsel was not Evasive During the July 29th Conference and Defendants' Counsel Never Induced a Devices Exchange While Knowing Defendants Had None to Provide**

47.     At the July 29, 2022 conference, I could not say when the Defendants left Valtron because, at the time, all I vaguely remembered was that they told me on May 20, 2022, that they left Valtron at the end of 2021. That is why when the Court inquired as to a specific date, I stated, "I believe it was second part of the year, **after summer**, but I don't have the exact date." Id. at p. 11. At the time, I also did not remember the exact date when they told me this, but I did tell the Court, "I have to go back and look at my notes. It was a few months ago," later adding

> I definitely did not know it at the March conference date. I may have known by the June conference date. I cannot recall right now. I would have to check my notes. But again, even if I knew, I don't remember right now, but even if I knew, that's not something that was discussed during our meet-and-confer after the court appearance.

Id. at p. 11-12.

48.     I also absolutely never knowingly suggested, implied, or stated that Plaintiff should exchange its devices in a reciprocal exchange while knowing that the Defendants had no devices to provide. That statement remains truthful, no matter how Ms. Harris wants to twist words' meanings. As explained above, on May 20th I learned that the Defendants left Valtron at the end of 2021 and not long after returned their laptops. But they also told me they would try to get the laptops back, gain access to some server, and look for other devices and ESI.

49.     This is why I proposed the language about "**actual control and possession**." When I learned on June 16, 2022, that the Defendants could not get anything else, I did not disclose any devices or ESI in the Initial Disclosures served on June 17, 2022. This triggered Counsel discussion about the same during the June 27 Microsoft Teams conference.

And this is when, as we were speaking for the first time since May 31/June 1, I informed Ms.

Harris that the Defendants left Valtron at the end of 2021, returned their devices after leaving,

and had no other devices or ESI to provide. I informed Ms. Harris merely 11 days after finding

out myself during our very first conversation involving anything specific about devices/ESI and

**MONTHS BEFORE PLAINTIFF WOULD HAVE TO PROVIDE ITS OWN DEVICES**

**OR ESI** to the Defendants.

**August 8th, 2022 Defendants Declarations and Defendants Counsel Letter to the Plaintiff**

50.     During the July 29 conference, the Court authorized Plaintiff to submit

questions to the Defendants and their undersigned counsel, but the Court also stated at the same

time, "if you feel that a response is inappropriate to any particular question or inquiry, you will

have a chance to tell me that." Id. at p. 19.

51.     I did exactly that. I discussed Plaintiff's questions, Ex. 41, with Ms.

Starovikov and Mr. Filippov, and we prepared declarations answering questions that we felt were

appropriate given the nature of the dispute and what happened. Together with declarations, I

included a five-page letter explaining what happened and why King and Spalding was never

misled. Ex. 42. To the extent known, I also answered all the questions posed to me by Plaintiff,

including that I **spoke** with Defendants about their discovery obligation in the middle of

February, that on May 20, 2022 Defendant's told me they left Valtron at the end of 2021, and

that they returned laptops to Valtron in the first half of January 2022. Id. I ended my letter by

writing "[t]ogether with this correspondence, I am including Defendant's declarations that

answer some of the questions posed by Plaintiff on August 1. Considering the above, I request

that King and Spalding withdraw the remaining questions as Plaintiff is not entitled to them at

this stage of the proceedings." Id.

52.     On August 11, 2022, Plaintiff filed another letter in Court asking for sanctions against the Defendants and their Counsel, arguing that facts were misrepresented to Plaintiff. Ex. 14. On August 12th, 2022, I did exactly what Your Honor said I could when stating, "if you feel that a response is inappropriate to any particular question or inquiry, you will have a chance to tell me that." By filing my August 12th letter, I was doing exactly that while also calling for sanctions against Plaintiff and their Counsel for repeatedly lying to Court. Ex. 43.

### Defendants Are Not Seeking Discovery from the Plaintiff for the Sole Purpose of Circumventing Plaintiff's Efforts to Neutralize the "Malware"

53.     From the beginning, both parties explored settlement options. However, Plaintiff was interested in settling with the Defendants but then proceeding with full force against some mythical Doe Defendants, while continuing to associate known Defendants with Doe defendants. What kind of settlement is that?

54.     What is more, Ms. Harris claims that Plaintiff has some secret discovery which Defendants cannot see because if they do, it will help them "circumvent Plaintiff's efforts to neutralize the malware." However, members of Google's Threat Analysis Group are posting online and running around giving conferences where they disclose in public everything Defendants would need to know to accomplish just that. For example, on December 7th, 2021, Google's Threat Analysis Group posted online an article called "Disrupting the Glupteba Operation" which disclosed a great deal of information about Google's investigation. Ex. 44.

55.     In another more egregious example, on September 28, 2022, Luca Nagy, a prominent member of Google's Threat Analysis Group, will be conducting a presentation titled "uncovering a broad criminal ecosystem powered by one of the largest botnets, Glupteba." Ex. 45. During the presentation, Ms. Nagy will take a "walk through [Google's] **in-depth investigation** starting with the botnet's distributions techniques, its capabilities, and how each

capability was monetized in this broad criminal enterprise." Id. at p. 1. Perhaps Google's representatives should attend Ms. Nagy's September 28 presentation, and they will get all the information to neutralize the malware.

56.     Plaintiff's willingness to openly discuss in-depth public details concerning its **investigation** of the alleged malware and the Defendants, clearly shows that Plaintiff's claim that Defendants only want discovery to circumvent Plaintiff's efforts to neutralize the malware has zero merits.

**Defendants Will Respond to Plaintiff's Discovery Demands by September 5, 2022**

57.     On August 25, 2022, King and Spalding emailed me asking whether I intended to provide any responses to Plaintiff's discovery demands. Apparently, on July 19, 2022, King and Spalding served discovery demands by email. However, for some reason, I either never got that email, or it got mistakenly deleted or went to spam and got deleted there. These are just theories, and I cannot know for sure what happened to that email. What's more, we never discussed those demands orally or in any other email. Also, Plaintiff's counsel did not send discovery demands by regular mail nor asked and received a confirmation email from me that I received those discovery requests.

58.     Responding that same day, I informed King and Spalding that I never got the July 19 email. The following day, on August 26, I discussed the same with the Defendants, and they agreed to respond to Plaintiff's discovery demands. Later that day, I informed King and Spalding of the same, writing by email that responses to discovery demands will be provided within 10 days.

59.     On Monday, August 29, 2022, Plaintiff agreed to a ten-day extension to respond to the discovery demands and interrogatories, which Defendants will do on September 5, 2022.

**Plaintiff's Counsel Is Knowingly Proffering Irrelevant and Prejudicial Evidence**

60.    On multiple occasions Plaintiff's counsel knowingly proffered irrelevant and highly prejudicial evidence, specifically a transcript of a video posted on YouTube on April 16th, 2022. Even after being advised that the video is old, see Dkt. # 75, Plaintiff's counsel continues to use it, even in its motion for sanctions. See Pl.'s Ex. 19.

61.    The interview was done for a movie Mr. Loshak was filming, called Russian Hackers, and was being produced for Russian TV. See https://www.imdb.com/title/tt18573320/plotsummary?ref_=tt_ov_pl. The documentary consisted of three parts and was officially released on Russian TV in February of 2022, although, it was available on some resources as early as December 2021. My interview with Mr. Loshak was filmed approximately in January 2021.

62.    The three-part documentary featured multiple guests, including former hackers, former U.S. agents, and attorneys. Each guest only appeared for a few minutes in the film. My interview, just like all others, was only meant to be used for a few minutes. However, my interview never made into the documentary, as it was found to be too sensitive for Russian TV. Over a year later, the audio portion of the whole 1-hour interview, **raw and unedited**, was leaked to a known Russian YouTuber, who posted it on his YouTube channel. See https://www.youtube.com/watch?v=9B7ceTxPKBM.

63.    During the interview, I discussed with Mr. Loshak my experience with various cybercrime and other criminal cases. At some point, Mr. Loshak asked me, "[w]hat mistakes do hackers usually make that turn them into your clients?" I answered

> [m]any mistakes. I think the biggest mistake is having a work laptop that is also your personal laptop. There must be two. If a person has already decided to do hacking and cybercrime, their work and personal laptops must not intertwine. They can never, like, intersect. Plus, I don't

> know why, but a lot of the time guys who leave take these
> laptops with them. I don't know why.

See Pl's Ex. 19, at p. 11-12.

64.      Mr. Loshak responded jokingly "I think they want to work further." Id. at

p. 12. And then, clearly joking back, I said, "[g]uys, always leave a work laptop at home if you

leave. Id. My statement was clearly a joke, but I also meant it; I would never advise a potential

client to travel into a jurisdiction, where they are likely to get arrested, carrying all the

incriminating evidence with them. I am sure King & Spalding does not advise its clients to do

something like that, but it expects me to do something different.

65.      The YouTube recording is close to two years old, and it has no relevance

to this case. In the recording, I did not tell the Defendants in our case to hide any devices, as

claimed by Laura Harris. This is just another attempt to mislead this Court and ruin my

credibility. Ms. Harris must be sanctioned for this intentional misconduct.

**Defendants and Their Counsel Did Not Cause Spoliation of Evidence**

66.      Plaintiff argues that Defendants and their Counsel somehow caused

spoliation of evidence without providing any evidence whatsoever to support this outrageous

claim.

67.      Defendants found out about this case at the end of January 2022, but at

that time, their laptops were already returned to Valtron, a few weeks before that. After retaining

my services and being advised of the discovery obligations, the Defendants did not cause any

evidence to be lost or destroyed.

68.      In the course of discovery, Defendants will provide all the evidence in

their possession and control. For example, as part of responding to Plaintiff's discovery

demands, Defendants will respond to interrogatories and provide a number of documents,

including but not limited to partnership agreements between Voltron and 3rd parties, terms of service, agreement with Tochka Bank, agreement regarding the use of API, Don't.Farm User Agreement, agreement with the buyer of Don't.Farm, employment agreement between Voltron and Defendants, and NDAs between Voltron and Defendants. Defendants are also willing to be deposed and participate in the trial.

69.     King and Spalding did not present any evidence that the Defendants or their Counsel did anything to destroy or spoil any evidence. As was explained to me by Mr. Starovikov and Mr. Filippov on May 20th, 2022, they left Valtron at the end of 2021 and returned their laptops about 12 days or so later. They also assured me that since speaking with me about their discovery obligations on February 17, 2022, they did not destroy or lose any relevant evidence in the case.

70.     To me, their assurances sounded reasonable, and I believe them. Further, as soon as I learned on June 16 that the Defendants will not be providing **any devices or ESI**, I informed Ms. Harris about it 11 days later, when we spoke for the first time. I have done nothing to prejudice Plaintiff or cause any spoilation of evidence.

71.     Defendants tried to get some ESI and devices but could not for various reasons. Therefore, Defendants will disclose what they have in their possession and control and respond to discovery demands in due course of time.

**Defendants Provided All the Information Known to Them in the Initial Disclosures**

72.     Defendants provided all the information known to them in the Initial Disclosures, including known names, addresses, and telephone numbers of individuals likely to have discoverable information. Defendants also provided a list of documents that they will produce as part of discovery. Defendants are willing to provide whatever else they have in their

possession and control that is subject to discovery, but they cannot provide something they simply do not know or do not have.

73.     In its motion for sanction, Plaintiff complains that some of the individuals' last names were not provided in the Initial Disclosures. See Ex. 46. However, this issue was already raised by Ms. Harris in her July 19 letter to the Court, Ex. 47, where almost exclusively she talked about her need to get the last names. I responded six days later, explaining that

> Valtron was established on August 23rd, 2019, and the Defendants started working for Valtron in September 2019. From September 2019 until March 2020, Defendants worked at the Vatron office location. However, Defendants worked in the software development department and had little interaction or communication with other members of Valtron's team. Then, in March of 2020 Covid 19 pandemic hit the globe, and Moscow, like many other cities worldwide, went on lockdown. Valtron closed its offices, and all the employees switched to working from home. Defendants continued working from home, like employees of many other IT firms, even after the lockdown was lifted in July 2020, and until they left Valtron. This means that since March 2020, Defendants had no interaction with the individuals whose last names Plaintiff now demands. This explains why they do not know those individuals' last names. Defendants provided in the initial disclosures the full name of Vatron CEO, Chingiz Keklenov, the person who hired Defendants. Defendants also provided the name of Vadim, who was not even an employee of Vatron, and whom they have never met him in person, and therefore do not know his last name. Also, Defendants provided phone numbers for all the individuals and their addresses. The statute specifically requires that only information and documentation in "possession and control" or "to the extent known" must be disclosed. Plaintiff has the chutzpah, while not providing any initial disclosures of its own (something undersigned counsel believes is unjustified), to demand something that Defendants simply do not know and have no ability to obtain. Defendants provided all the information they are required under the statute. Plaintiff's counsel has all of those individuals' phone numbers and can call them to ascertain their last names; it appears that it has not even tried that.

Ex. 48.

74.     On July 29, 2022, the parties held a telephone conference, during which Ms. Harris decided to talk almost exclusively about the devices, even though her July 19 letter concerned last names. Regardless, at the very end of the conference, Ms. Harris stated

> Your Honor, I think the only open issue pertains to the last names that were not disclosed in connection with the initial disclosures. We understand Mr. Litvak's position that his clients have no last names to provide, but we certainly don't credit that statement given the long history that his clients have had in working with those individuals. But again, unless your Honor has any further measures to take in that regard, we think that we are at an impasse there.

Ex. 40, at p. 20.

75.     The Court responded, "[y]es. [a]nd I don't have any further measures to take at this point. You have the defendants' position; they do not know those names." Id. at p. 21.

76.     Considering that the issue of last names was explained and resolved by the Court, it is completely unethical for Plaintiff's counsel to keep raising this issue in its motion for sanctions. This is nothing more than another blatant attempt to mislead the Court and win this litigation at any cost.

77.     For the reasons stated here and in the Memorandum of Law, I respectfully request the Court deny Plaintiff's Motion in its entirety and grant Defendants' Motion for Sanctions.

/s/ Igor Litvak____
Igor Litvak, Esq.
