UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GOOGLE LLC,

                      Plaintiff,                      Civil Action No.: 1:21-cv-10260-DLC

- against -

DMITRY STAROVIKOV;
ALEXANDER FILIPPOV;
and Does 1-15,

                      Defendants.
------------------------------------------------------------------X

## DECLARATION OF ATTORNEY IGOR LITVAK IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AGAINST PLAINTIFF

I, IGOR LITVAK, declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S. Code § 1746 that the following is true and correct:

1. I represent Defendants DMITRY STAROVIKOV and ALEXANDER FILIPPOV in this matter. I submit this Declaration in further support of Defendants' Motion for Sanctions against Plaintiff.

**Plaintiff Is Misleading the Court When It Argues That Defense Counsel Tried to Induce Google into a Reciprocal Devices Exchange While Knowing That Defendants Claimed to Have No Relevant Devices**

2. When the Defendants told me on May 20, 2022, that they left Valtron at the end of last year and returned devices after leaving, I was in the middle of **negotiating** a language for the Rule 26(f) report. When I learned the new information from the Defendants, I specifically modified the language of the proposed report by adding "**over which the defendants have actual and physical control and possession**" to cover the possibility that the Defendants may not have everything or anything at all. It was not an attempt to deceive Plaintiff but to have a language in the proposed report that would protect my clients in the event something was not found and/or produced.

3.      I am sure that if such language was not included in the report, Plaintiff would now be arguing that I lied in the report itself since I knew that Defendants did not have their laptops, but I did not account for that possibility in the proposed report. Furthermore, Plaintiff is accusing me of adding language in the report that reflected the facts as I knew them, even though that is exactly what I am supposed to do. Moreover, Plaintiff seems to suggest that while negotiating a language of a proposed Rule 26(f) report, or by extension when negotiating anything at all, attorneys have obligations to disclose to each other the very reasoning for each party's negotiating position. Obviously, no such thing exists in the American system of jurisprudence, if it did, it would destroy the world of settlements and other alternative dispute resolution methods.

4.      While negotiating the joint report, Mr. Harris did not disclose to me why Plaintiff changed the language of the proposed report many times, and I am sure she did not inform me every time she found out something new about Google's devices or ESI. However, Plaintiff's counsel suggests that Defendants' counsel must do exactly that, which would probably be unethical and definitely not in anyone's client interest.

5.      May 31, 2022, email where I state in part "why we took out the paragraph about exchanging computers" is taken out of context and did not imply or pressure anyone into devices exchange. As was explained previously, Google's new proposed language for the joint status report took out my proposed language "**over which the defendants have actual and physical control and possession**" so when emailing and asking why we took out the paragraph about computer exchange, I was clearly referring to why a certain paragraph was taken out, not to suggest or pressure anyone to include a device exchange while giving nothing in return.

6.      What is more, I agreed to every Plaintiff's proposed language, including the language which became the final language that both parties signed and filed in Court. I never pressured Plaintiff's counsel into anything, all I wanted to do was to add some of my own

language in paragraph C, but when Plaintiff pushed against it, I agreed to Plaintiff's language without any of my own modifications. Parties even barely had time to engage in serious negotiations regarding the report, as most of the emails and discussions took place on May 31, the day the report was due. Any suggestions that I pressured Plaintiff Counsel into anything is false.

7.   After the parties finished negotiating the language for the proposed status report, I was still waiting to hear back from the Defendants as to whether they were able to get any other relevant devices or ESI. The Initial Disclosures were not due until June 17, so I decided to give them until June 16. On June 16, we spoke again, and they informed me that at that moment, they could not find anything and, therefore there would be nothing regarding ESI or devices we could disclose in the initial disclosures. On June 17, I finalized the initial disclosures and emailed them to King & Spalding; the disclosures did not list any devices or ESI. Ex. 1 On June 24, Plaintiff emailed me complaining that initial disclosures were deficient because they did not list any devices or ESI. Ex. 2. As a result of the June 24 email, parties scheduled a conference on June 27 to discuss those missing disclosures. When I spoke to Ms. Harris on June 27, the main topic of the conversation was the missing devices and ESI from the initial disclosures. And this is when during the conversation, I stated very clearly to Ms. Harris that I recently found out that the Defendants left Valtron at the end of last year and returned their devices to Valtron after leaving and therefore had nothing to provide to Google. Although Ms. Harris was very skeptical, I do remember her telling me that if they still had a way to get those devices or ESI back, they had an obligation to do so, to which I responded that there was no way for them to get it back. On June 27, I served amended initial disclosures which also did not list any devices or ESI. Ex. 3.

8.   Plaintiff's counsel assertion that I tried to induce reciprocal devices exchange while providing nothing to Google makes no sense since it would require Defendants to go

through the whole discovery process, including providing initial disclosures and responding to interrogatories and request to productions without once alerting Google nor its Counsel that Defendants had no devices or ESI to provide. How would that even be possible, considering that the Defendants are facing one of the best law firms in the world? Is Ms. Harris suggesting that she and her army of associates working on this case would not notice any of that information missing in those disclosures and therefore they would be somehow fooled into giving Defendants Google's devices and ESI while getting nothing from the Defendants?

9. Ms. Harris and I never discussed anything specific regarding devices while negotiating the joint status report, Ms. Harris does not even try to controvert this. I believe the reason why was because Ms. Harris did not want to disclose to the Defendants anything about Google's devices, so she made sure we avoided this topic like the plague. Since Ms. Harris did not talk about devices, I did not talk about the Defendants' devices and the parties' communications were almost exclusively related to the language of the joint report, while barely discussing why each party took the position it took regarding various proposed languages.

10. The very first-time parties discussed anything specific regarding devices or ESI was on June 27, and this is when very clearly, I told Ms. Harris that the Defendants recently informed me that they left Valtron at the end of 2021 and returned their devices to Valtron after leaving.

**Plaintiff Is Misleading the Court by Plaintiff's Counsel New Claim of What Counsel Learned from the Defendant's Counsel on June 27 Since It Is Contradicted by the Court Record and Plaintiff's Counsel Own Statements**

11. For the very first time, Ms. Harris now asserts that on June 27, I only informed her that Defendants returned their laptops to Valtron, and then later, on July 19, I informed her that Defendants also left Valtron. See ECF # 120 at p. 17. However, this new excuse does not withstand any scrutiny for several reasons and is contradicted by Ms. Harris' own statements and

court record.

      12.    After the June 27 conversation, I did not hear again from Ms. Harris until July 18, when she wrote "I'm writing to follow up on **our June 27 call** and your clients' amended initial disclosures." Ex. 4 at p. 2.

> She continues by writing
>
> [w]e are troubled by your representations **on our call that (i) your clients do not "have" any relevant devices, and**, in apparent contradiction to that representation, that (ii) any devices they do "have" are owned by Valtron and therefore are not discoverable . . . [r]egardless, the question whether any particular device is owned by Valtron is irrelevant. If your clients have the practical ability to obtain documents or devices that might be relevant to the case, they are obligated to produce those materials.

Id.

      13.    Ms. Harris concludes the email by stating, "[p]lease let us know immediately if you intend to continue to object to the production for inspection of any electronic devices, or if your clients contend they no longer possess any devices. Id. at p. 3. When Ms. Harris wrote "practical ability to obtain documents or devices that might be relevant to the case," I believed she was implying that since Defendants were somehow connected to Vatron in the past, they can still get those devices back and produce them in discovery. This is what Ms. Harris also told me during the June 27 conference.

      14.    After some back and forth that same day, I responded the following day, writing on July 19

> Laura, I never said that my clients preserved, had in their possession or intended to produce any devices subject to discovery, I am not sure where you got that from. **The last time we discussed this issue I told you all the devices were returned to Valtron when they finished working for Valtron, and therefore, they do not have any devices in their possession that are discoverable, there is no contradiction.**

<u>Id</u>. at p. 1. After this email, Ms. Harris filed a letter in Court that contradicts her newly made claims. In Plaintiff's July 19 letter to the Court, Ms. Harris describes what happened as follows

> After Google identified the deficiencies their amendments failed to fix, Defendants' counsel responded that they "have nothing else to add." Counsel also represented (for the first time) that Defendants have "**finished working for Valtron**," and do not have any devices with discoverable information because they "**returned to Valtron**" such devices and are now unable to "**get those devices back from Valtron.**"

Ex. 5, at p. 1-2.

15. So, in Ms. Harris' July 19 letter to Court, Ms. Harris claims that on July 19, I told her for the first time that Defendants left Valtron and returned their devices to Valtron, even though now she claims that those two things happened on two different dates.

16. Furthermore, on July 25, I filed a response to the July 19 letter, where I write

> During the same June 27 meet and confer, I also explained to Google's counsel, that the Defendants at some point worked in the same location with some of the individuals identified in the initial disclosures, but it was some time ago, and that the Defendants hadn't had any communication or interaction with them in some time. What's more, I further advised Plaintiff's counsel that any electronic or digital devices Defendants used during their employment at Vatron, have since been returned to Valtron and are no longer in Defendants' possession.

Ex. 6. at p. 1. After this filing and in further proceedings and filings, I always made it very clear that on June 27, I informed Plaintiff of both facts - that Defendants left Valtron and returned their devices. <u>See</u> Ex. 7, 8. I even repeated it during the Court's conference on July 29. Ex. 9 p. 13, 14, 19.

17. During the July 29 court conference, Ms. Harris did not correct me to say that, in fact, I told her about the Defendants returning devices on June 27 and about the Defendants leaving Valtron on July 19. Instead, Ms. Harris filed a motion for sanctions, boldly claiming that I informed her of both on July 19. Pl. Mem. of Law, Dkt. # 111, pp. 1, 8, and 15. (Page 1 –

"Only after Google made clear that it would seek Defendants' devices did Mr. Litvak claim—on July 19—that Defendants no longer work for Valtron and that they could not produce relevant devices." Page 5 – "On July 19, Google identified continuing deficiencies in Defendants' initial disclosures. Mr. Litvak responded that they "have nothing else to add," and he represented **for the first time** that Defendants "finished working for Valtron," "**all the devices were returned to Valtron**," and Defendants "do not have any devices in their possession that would be subject to discovery and there is no way for them to get those devices back from Valtron." Page 15 – "Mr. Litvak told Google for the **first time on July 19 that "all [Defendants'] devices were returned to Valtron**" and "there is no way for them to get those devices back from Valtron.")

18. After being confronted with her own email in Defendants' opposition to sanctions, an email which showed that Ms. Harris misled the Court when claiming that I only told her on July 19 that Defendants left Valtron and returned devices to Valtron, Ms. Harris changed her position and now she claims something completely different, to wit, Ms. Harris, for the very first time, claims that on June 27, I told her that the Defendants returned their devices to Valtron, and then on July 19 I also told her that they left Valtron. Such a drastic shift in position can only be explained one way, Ms. Harris gets caught lying, and instead of acknowledging the lie or perhaps a mistake, Ms. Harris doubles down to come up with some new explanation.

19. The only reason why Ms. Harris initially asserted July 19 as the disclosure date is to make me look as if I tried to mislead Plaintiff, even though in reality, I informed Plaintiff of what I knew 11 days after finding out myself and months before Plaintiff would have to provide its own devices or ESI.

**Defendants Provided Discovery in Their Possession and Intent to Fully Comply with Their Discovery Obligations**

20. Defendants have done nothing that would justify an entry of default or any sanctions against them, and, to the extent possible, they have the full intention to comply with

their discovery obligations. Defendants already provided almost everything that Plaintiff requested, and which is in their possession. What is more, the Defendants provided discovery to the Plaintiff relevant to their defenses and made good faith efforts to obtain their Russian international passport so they could attend depositions in a country ordered by the Court.

21. If there is something else in their possession, like personal devices that the Court orders them to turn over, they assured me that they would do that as well. In fact, after serving Defendant's discovery responses, I have asked Ms. Harris multiple times to let me know if there are still any discovery responses outstanding or missing. However, instead of working with me and letting me know what is still missing, so it can be provided to Plaintiff, Mr. Harris runs to Court to accuse Defendants of not complying with their discovery obligations.

22. On September 5, 2022, Defendants served their Discovery Responses, which included 11 PDF files, 7 jpeg files, and 46 files containing source code for working with OAO Tochka (Bank Otkritie).

23. All of these documents are important and relevant to the Defendants' defense in the following ways – 1) Defendants provided employment contracts with Valtron, which shows that they were merely employees of Valtron, had limited information about its activity, and had a specific job related to software development; 2) Defendants provided various screenshots (jpeg files) and the complete source code for working with the bank which shows that they legitimately worked with the bank using bank's API. API was used as the method for opening, blocking, and changing cards' currency amount limits, and other typical bank card operations. Defendants will use this to establish at trial that they offered a legal platform to various webmasters, and then those webmasters themselves conducted further activity using the Extracard website to communicate with the bank. Basically, Extracard was used by Webmasters as a regular internet bank, for the purpose of issuing and working with debit cards, legitimate

activity in Russia and even in the U.S.; 3) Defendants provided a document named rent.dont.farm, which shows that Valtron had a website on which anyone could sell access to their Google account. Defendants will use this to establish that Valtron did not violate Google's terms and conditions; 4) Defendants provided a document entitled EULA, which is an agreement Defendants believe related to the use of mining and proxy, which Defendants believe will help establish Defendants' assertion that Valtron has done nothing illegal when working in mining or with proxy.

24. If Defendants establish that access to Google's accounts was obtained legally and did not violate Google's terms and conditions, and that Valtron's collaboration with the bank was done legally and that they had no control over the bank accounts, and that mining and proxy also did not violate any rules or laws, or Google's terms and conditions, and was undertaken according to written agreements, then Defendants believe they would have reasonable defenses to Google's allegations and may win at trial.

25. On July 29, the Court did order the Defendants and me to respond to Google's discovery questions by August 8, but the Court also stated that "if you feel that a response is inappropriate to any particular question or inquiry, you will have a chance to tell me that." Id. at p. 19. On August 8, Defendants and I responded with all the information we felt was appropriate, Defendants submitted declarations, and I submitted a 5-page letter to King and Spalding, explaining my position and why Plaintiff was not entitled to any additional information. Ex. 7. On August 12, I filed a 2-page letter in Court, Ex. 8, with the 5-page letter attached as an exhibit, ECF # 104, which fully explained my position as to what happened and why Plaintiff was not entitled to any additional information.

26. On September 6, Defendants served their discovery responses, in which they did not disclose their personal computers they are currently in possession. They did not indicate that

they did not own or did not use any devices since January 2022; instead, the Defendants did not disclose that information. Defendants did not believe that such information was relevant to the case and would only be used by Plaintiff to further target them.

27.     However, I continued to urge Defendants to provide such information, and I explained to them that for now, we are just disclosing information about the devices, such as model and serial number, and that we would have an opportunity to object to the production of actual devices at the appropriate time. Plaintiff also indicated that it would file a motion to compel if Defendants did not provide information on their current devices. So, on September 15, Defendants voluntarily amended their discovery responses and provided information on their personal computers. Defendants also assured me that if the Court orders them to turn over their personal devices, they will comply with the Court's order and will turn them over to Google.

28.     The Defendants position that their personal devices have no relevant information and therefore are not discoverable. If Plaintiff believes it is entitled to those devices, it can file a motion to compel, to which the Defendants will respond. If the Court eventually orders Defendants to turn over their personal devices to Google, they will do so. However, it is not appropriate to use such refusal in the motion for sanctions since such issues are best resolved in a motion to compel. And if the Defendants still refuse to provide such devices even in the event of losing such motion, then the Plaintiff can make any arguments related to Defendants' discovery conduct, not before.

29.     Further, Defendants are not refusing to provide email accounts they used, and Plaintiff never requested this information. Instead, Plaintiff asked Defendants to provide email accounts of others, such as customers and associates of Valtron, which Defendants do not know or have. See Ex. 10. As for the Defendants' emails, all Plaintiff asked for was for Defendants to provide "[d]ocuments sufficient to identify all email accounts or addresses used by you at any

time since January 1, 2011." Ex. 11 at p. 10. Defendants and their counsel never heard of any documents that may identify an email account or address; whether Plaintiff was asking for contents of emails, or something else, it was not clear. Defendants responded to this question by stating the following

> Defendants object to this Request on the grounds that it is vague, overly broad, and subject to varying interpretations, and that compliance with the Request would be unduly burdensome to Defendants and would outweigh any probative value of the evidence sought to be obtained in connection with said Request. Defendants further object to this Request on the grounds and to the extent that it may subject it to undue burden, oppression, annoyance, and embarrassment. Subject to and without waiver of the foregoing objections and the General Defendants also state that they do not have any documents to identify the email accounts they used since 2011.

Pl. Ex. 5 at p. 13.

## Plaintiff's Spoilation Claim is Baseless

30. Since being advised of their discovery obligations by me in mid-February of 2022, Defendants did not destroy or lose any discoverable information or devices. In fact, in early September 2022, they provided a substantial amount of discoverable information to Plaintiff.

31. Defendants did not know at the end of December why they were fired by Valtron; all they were told was that it was because of not enough work. Now looking back, they realize that the slowdown was probably somehow related to Google's lawsuit, but no one at Valtron told them that at the time. Also, because of the pandemic, they were not at Valtron's Moscow offices for over a year and did not know what was happening inside the company.

32. After being fired by Valtron they were asked to return their Valtron's laptops, which they did in the first half of January of 2022. Then, at the end of January 2022, they heard from some acquaintance in some chatroom that there was some lawsuit from America involving

them. They did not discuss the case with the individual since he himself did not know anything beyond that. This is why the person is not disclosed in discovery responses since they did not "communicate about the case," the person merely informed the Defendants that there was some case in America with their names, nothing else. Defendants maintain that the only individuals with whom they discussed the case are Mr. Starovikov's mother and Valtron's CEO.

33. I never stated in any declarations that the Defendants lost their work at Valtron as a result of this lawsuit. All I stated was that the Defendants were let go at the end of December because of not enough work. I also wrote that after they found out about this lawsuit, they started experiencing its negative side effects. For example, projects unrelated to Google's allegations that were planned with Valtron, and others were canceled or withdrawn. Defendants had a hard time finding a job in the Russian IT industry or even renting an apartment. In Russia, potential landlords and employers often run applicants' names on the Internet during background checks, and when they did find information about this case during those checks, they would refuse to rent to or work with the Defendants.

34. Plaintiff never explained why it decided to sue two employers of a Russian IT firm, **while not suing the firm itself or its CEO**. On many occasions, I told Plaintiff's counsel that many of our discovery issues would be resolved if Google amended the complaint and brought Valtron into this case, but for some unknown reason, Google refuses to do so. It now appears that it was Google's actions may have gotten the Defendants fired from Valtron in the first place, which resulted in them being forced to return their devices. Regardless, Plaintiff still blames the Defendants for the loss of devices, even though it was Google's actions that likley led to that outcome.

35. It is not the Defendants' fault that they found out about this case at the end of January. During parts of December and January, many Russians take their New Year vacations,

which usually last until the middle of January. Defendants were spending time and vacationing with family during parts of December and January and therefore did not have an opportunity to learn about the case when it was first publicized. Also, since they did not work in Valtron's offices because of the pandemic, they had limited knowledge of what was happening inside the company, which may have prevented them from learning about this lawsuit earlier.

**Defendants Made a Reasonable Settlement Offer to the Plaintiff, but Plaintiff Refused the Offer and Unjustifiably Accused Defendants of Extortion**

36.     At the end of August, I received Plaintiff's demands for discovery, in which Plaintiff identified 10 Bitcoin addresses to which it was seeking private keys from the Defendants. Defendants related to me that they did not know or have access to those Bitcoin addresses. However, to respond to the demands, the Defendants discussed these Bitcoin addresses with Valtron management and were informed that if they could reach a settlement with Google, Valtron would release these keys to Google. After the Defendants informed me of this, I scheduled a settlement conference with Plaintiff.

37.     On September 8, the parties held a settlement conference, during which I conveyed the Defendants' offer to Plaintiff. The offer contained the following terms: Defendants will obtain the Private Keys from Valtron to be given to Google, and Defendants agree not to engage in similar activities in the future without admitting that they did anything wrong or illegal in the past. In return, the Defendants proposed that Google will reimburse them for already paid attorney's fees, dismiss the case against the Doe Defendants, stop referring to Defendants as criminals or cybercriminals in public, refrain from reporting to law enforcement prior alleged conduct and pay $1 million to each Defendant to compensate them for the reputational harm caused by the publicity of this lawsuit against them. I also informed K&S that the Defendants would likely agree to a permanent injunction. Lastly, I told K&S that the Defendants "**believe**" private keys will help Google to shut down the software Google calls Glupteba but that they do

not know anything about these keys themselves. The conveyed offer was labeled "FRE 408 settlement conference." After not hearing for a few days, I emailed to follow up, and K&S responded, stating that the Defendants' offer was rejected. I responded, stating, "[d]o you want to at least make a counteroffer that I can take to my clients???". K&S responded that their counteroffer was just for Defendants to agree to a permanent injunction. Ex. 12.

38. During the settlement conference of September 8, I made it very clear that the basis of the Defendants' proposal to be paid $1 million each was to compensate them for the harm this, what Defendants believe, a baseless lawsuit has caused them. Furthermore, never during any communications did I even hint or imply that if Google refused to settle on Defendants' terms, Defendants would undertake any action to cause Google any harm. In fact, it was Defendants' position from the beginning of this lawsuit that they did not control any botnet and did nothing illegal. Plus, this was an opening offer that contained various different terms; if Google had made a reasonable counteroffer, for example, just covering the attorney fees and/or dismissing the case against the Doe Defendants, Defendants might have accepted it. Neither Defendants nor I framed the offer as take it or leave it; in fact, I even asked for a counteroffer to take to my clients after Google rejected the initial offer. There was never any threat to cause any harm to Google, nor did the Defendants condition giving Google private keys on Defendants receiving $ 1 million each, as those were separate issues and proposals.

39. Defendants and I never agreed with Plaintiff's assertion that Defendants' counterclaims were frivolous. Instead, Defendants agreed to dismiss the counterclaims because they did not have the financial resources to fight a motion to dismiss, which Plaintiff threatened unless the counterclaims were voluntarily withdrawn. But Defendants never gave up their belief that they were hurt by Google's lawsuit nor their wish to be compensated for the resulting harm. Their offer to be compensated $1 million each was based on that belief.

40. The Defendants tried to help Google by doing all they could, including finding ways to provide Google with what Google claims it needs to stop the wrongful activity. Instead, Google now uses the Defendants' goodwill against them.

41. Plaintiff's counsel claims that Defendants tried to extort Google even though they never made any threats or any indications that they would cause Google any harm if the settlement offer was rejected**.** Plaintiff's extortion theory relies on the assumption Defendants have possession and/or control over the key – they do not.  They simply disclosed to Goggle that there is a mere possibility they could obtain those keys from the owner of Valtron as a condition of settling this lawsuit against them and the Doe Defendants.  Moreover, Defendants monetary proposal has nothing to do with those key as they reasonably believe they should be entitled to be compensation for the harm caused by this lawsuit.

42. Plaintiff uses the case of Michael Avenatti as if to imply that what happened, in that case, is somehow similar to ours, when in reality, nothing can be further from the truth. In Avenatti the attorney tried to extort Nike for over $20 million **for himself** by threatening to release some private information that would damage Nike's stock. See https://www.justice.gov/usao-sdny/pr/us-attorney-announces-arrest-michael-avenatti-engaging-scheme-extort-public-company.

43. In our case, Defendants made a reasonable offer without making any threats or conditions and even asked for a counteroffer. In reality, Defendants were interested in settling the case and would have shown great flexibility to get there. But by threatening criminal prosecution Plaintiff's counsel completely destroyed the possibility of resolving this case, and now Defendants believe they have no choice but to continue this litigation.

44. Further, Plaintiff's letter destroyed the confidentiality of the settlement

negotiations. Courts recognize that this precept of confidentiality is a hallmark of the mediation process because it permits the parties to seek a mutually beneficial, interests-based outcome without fear of compromising a litigation position if the mediation is unsuccessful. In our case, Plaintiff blatantly ignored these rules by disclosing settlement terms.

45. What is more, Rule 3.4 precludes a lawyer from presenting, participating in presenting, or threatening to present criminal charges solely to obtain an advantage in a civil matter. In our case, Plaintiff's counsel threatened to present criminal charges to gain an advantage in a civil matter by forcing the Defendants to settle the case, for which Plaintiff's counsel must be sanctioned.

**Defendants Presented Multiple Instances of Plaintiff's Counsel Misleading the Court, Which Warrants Sanctions Against the Plaintiff and its Counsel Pursuant to Court Inherent Powers**

46. First, Plaintiff claims that it did not mislead the Court regarding the jurisdiction waiver because it provided the Court with the emails, thus providing the Court with "full record [which] eliminates the notion that it mislead the Court with intent to deceive. See ECF # 120 at p. 15. However, it did not tell the Court about our conversations regarding this topic and that during those conversations, I made it very clear that the waiver was conditioned on Google vacating the notice of default. Therefore, it did not provide the Court with the "full record," instead it made some absurd arguments about the jurisdiction waiver while providing the emails, maybe hoping that the Court would not notice them buried in the pile of other paperwork. Even the Court noted in its decision that "[i]n both instances, however, the defendants' waiver was contingent on Google withdrawing its motion for default judgment. As Google has not done so, the defendants have not waived their personal jurisdiction defense." Ex. 13 at p. 12.

47. Second, Plaintiff argues that it never misrepresented to Court my statement about Defendants' concerns about extradition. As proof, it presents my admission that Defendants were

concerned; however, it does not explain the circumstances of that conversation or discloses that I filed a letter in Court on June 3 stating

> did express to Laura Harris during a meeting that my clients are concerned about going to a country with an extradition treaty with the U.S., **but I never categorically stated that they would not travel to such a country**. Furthermore, there is no evidence that Defendants were indicted or wanted by U.S. authorities.

Ex. 14 at p. 2. As I explained in more detail in the Defendants' motion for sanctions, Ms. Harris was asking me some questions about the Defendants being extradited, in response I told her something to the effect of "of cause my clients, just like anyone, don't want to be extradited, but it doesn't mean they will not cooperate with discovery and depositions." Ms. Harris and her army of associates then turned that statement upside down to mislead the Court and get one-sided discovery.

48. Ms. Harris claims that all of her colleagues- five other attorneys besides Ms. Harris - remember that same thing regarding my statements concerning Defendant's extradition concerns. However, none of them submitted any declarations to verify the same, and I guess they decided not to misrepresent on Ms. Harris' behalf.

49. Third, Plaintiff claims that working "closely" and working in the "same location" has the same meaning and, therefore, it is not misleading. I would argue it does not have the same meaning, especially in the context it was used. This issue came up in the context of whether Defendant should have been expected to know the last names of other Valtron's employees, who were disclosed in the initial disclosures. See Ex. 15. Plaintiff was arguing that since they worked closely with those individuals, they should be expected to know those individuals' identities. See Ex. 5. Plaintiff's argument would not make sense unless Defendants worked "closely" with those individuals, which is why Plaintiff Counsel twisted my words, turning them from "working in the same location in the past" to "Defendants work **closely** with

the individuals they identified, and that he had not asked his clients basic questions regarding these individuals' identities or the specific information they possess." Id. at p. 1.

50. Fourth, I never asserted that Google misrepresented to Court what I said during the YouTube interview. Instead, I argued that after being advised numerous times that the YouTube interview predated our case and had nothing to do with it, Google continued to proffer it as somehow relevant to the issue of sanctions. I further asserted that this was done for the sole purpose of ruining my credibility with the Court. See ECF # 115 at p. 13. The only statement I asserted that Google misrepresented was that I told the Defendants to keep their laptops in Russia, Id., which remains true as I never told the Defendants such a thing, in the YouTube interview or at any other time.

51. Fifth, as explained above, Plaintiff's Counsel did misrepresent to Court as to when I informed Google that Defendants left Valtron and returned their laptops. As corroborated by emails, conversations held in Court, Court filings, as well as by Ms. Harris' own statements, I informed Plaintiff about it on June 27, 11 days after finding out about it myself. Plaintiff counsel's new excuse for why she lied in her motion for sanctions, which she brings up for the first time, makes no sense and is contradicted by her own filings and statements.

52. For the reasons stated here and in the Memorandum of Law, I respectfully request the Court deny Plaintiff's Motion in its entirety and grant Defendants' Motion for Sanctions.

/s/ Igor Litvak
Igor Litvak, Esq.